## WILLIAM A. LEWIS AND WIFE *vs.* THE PHŒNIX MUTUAL LIFE INSURANCE COMPANY.

*L* was insured in a life insurance company by a policy which provided that the annual premium, payable in part in cash and in part by a premium note, should be paid on or before the 9th of May in each year. The company sent him a notice of the premium falling due on the 9th of May, 1874, which he returned for correction, an error being discovered in it, and a new notice was sent him, which reached him on the 9th of May. On that day he delivered a check for the cash part of the premium to *B*, who had conducted the business with the company for him, but was not its agent, and *B* on the 13th of May delivered the check to an agent of the company, who gave him a renewal receipt for *L*. *L* had died suddenly on the 13th, before the agent received the check, but he had no knowledge of the fact when he received it. The premium note that was to have been given at the same time was never given. Held . that, upon these facts, as not affected by any question of estoppel, the policy was forfeited.

The failure to make the premium note would have been enough of itself to work a forfeiture of the policy.

In addition to the provision of the policy that the premium must be paid on or before the day it fell due, there was a notice on every renewal certificate issued, that no agent had authority to receive any premium after the day it became due without special permission from the officers of the company. Held that the local and limited agents of the company were not to be regarded as having the power, by a mere course of dealing on their part with the policy-holders, to establish a custom which would nullify these provisions and bind the company without its consent or knowledge.

In the consideration of certain evidence with regard to a custom in this respect, reported in the case, the court was of opinion that all that could be claimed from the custom was, that the company or its agents were in the habit of waiving strict payment at the day in some cases, when there had been no change in the health or condition of the insured.

This being so, there would be nothing that would bind the company to waive

strict payment in any case, but they would be at liberty in all cases to insist upon strict performance.

The custom manifestly did not extend to a case in which the insured died after the premium fell due and before payment.

The error in the notice sent to the insured was only as to the amount to be paid, and he knew it to be an error and sent it back for correction. There was no intention on the part of the company to mislead him; the day of payment was correctly stated, and the corrected notice reached him the day the premium fell due. The court below charged the jury that if they should find that it was the custom of the company to give notice thirty days before of payments falling due and that the insured knew of the custom and tnat by the error in the notice he was prevented from making the payment when otherwise he would have made it, then the company would be estopped from claiming that the payment was not made in due time. Held to be error.

The court also charged the jury that, if the agent sent the money to the company, and the company with full knowledge of all the facts kept it, claiming it as their own, then they had waived the forfeiture of the policy. Held that the jury might have been misled by this instruction, and that they should have been instructed to ascertain whether at the time they received the money they knew of the death of the insured, and if n t, when they first received the knowledge of it, and whether they afterwards retained the money intending to give validity to the policy or to await the result of the claim made upon the policy.

A waiver is an intentional relinquishment of a known right.

It is the duty of the court to submit to the jury all controverted questions of fact when there is any evidence to support the respective claims of the parties; but if a claim is made which is wholly unsupported by proof, it is error to submit it to the jury as if the evidence justified the claim, as the jury would be in great danger of being misled.

ASSUMPSIT upon a policy of life insurance; brought to the Court of Common Pleas of New Haven County, and tried to the jury, on the general issue, before *Robinson, J.*

The policy was dated May 9th, 1873, and was upon the life of George T. Lillie for the sum of $1,000, payable at the age of thirty-eight, the assured then being twenty-eight years of age; the amount being payable to his mother, one of the plaintiffs, in case of his death before reaching that age. The provision of the policy with regard to the payment of the annual premium was as follows: "This policy of assurance witnesseth that the Phœnix Mutual Life Insurance Company of Hartford, Conn., in consideration of the representations made to them in the application for this policy and of the sum of one hundred and thirty-two dollars and eighty-eight cents to them duly paid by George T. Lillie, and of the annual

payment of a like amount on or before the ninth day of May in every year during the continuance of this policy, do assure the life of George T. Lillie, &c."

The renewal receipts given by the defendants upon the payment of the annual premiums, contained upon their backs a printed notice that no agent of the company had authority "to receive any premium after date of its being due without special permission from the officers of the company."

The insured died suddenly on the 13th of May, 1874. The only important question in the case was whether the premium due on the 9th of May, 1874, had been paid by the assured and accepted by the company.

Upon this point the plaintiffs offered in evidence the following deposition of Ambrose E. Beardsley :

"I lived in Derby for thirty-five years, except three years, while in the public service; have been agent of the defendants, at one time from December, 1869, up to October, 1873; was located most of the time at Derby and vicinity; my territory embraced New Haven County. Mr. Lillie died May 13th, 1874. Most of the time my business was to solicit applications for insurance, and collect the premiums. I forwarded the premiums the first three or four years to John B. Powell, after that to G. E. Holloway. From the time I ceased connection with the company to the time of the death of Mr. Lillie, Mr. Holloway was general agent for Connecticut and Rhode Island. From the time I ceased connection with the company to the time of Mr. Lillie's death, Mr. Jewett had the agency; at the time of Mr. Lillie's death, C. E. Tillinghast was agent for the company, and had been since January, I think. It was the custom, and the instruction received from the general agent at Hartford to all the sub-agents, to send notice as near thirty days in advance of the time the premium was due as possible. Renewal receipts were forwarded thirty days before the premium was due, and notices were always sent as soon as the receipts were received. Renewal receipts were in the ordinary form of renewal receipts of insurance companies. They were signed by the secretary of the company, and became effective when countersigned by the general

agent at Hartford, and were ready for delivery when received by the sub-agents. The date of the policy of Lillie was May 9th, 1873, and premiums on his policy were due semi-annually; none of the premiums were paid to me as agent of the company.

"I was in the bar-room of the Bassett House, Birmingham, Friday evening, May 8th, 1874. Mr. Lillie said, 'Beardsley, I would like to have you give me a little information in regard to my insurance in the Phœnix.' I asked him what was the matter; he said the only trouble was he had been called upon for twice as much money as they had before. I saw the notice. I took it to Mr. Tillinghast, the agent from whom it came, at New Haven; I gave it to him and showed him his mistake; can not tell whether I left it with him or not. He was the agent to whom Mr. Lillie was to make the payment of the premium; I showed him the renewal notice, which was incorrect; I told him that he had sent a notice of the premium to be paid annually, when it should have been the semi-annual payment; this was May 9th, 1874. He turned to his books and found that I was correct. He said he would make a correct notice, which he did, and gave it to me and asked me to give it to Mr. Lillie, and explain it; I told him I would do so. Before he gave me the corrected notice, I told him Mr. Lillie was ready to pay his premium, and would pay it as soon as he knew what to pay. I told him it was possible he might be there himself that day. I told Mr. Tillinghast that that premium would be paid, and if not paid on that day it would most certainly in two or three days; and I told him if anything should happen to Lillie I hoped he would not take any advantage of not having actually received the money on the day on which it was due, for the fault did not rest with Lillie, but from the fact that the notice sent was incorrect; he said 'Certainly not.' Mr. Tillinghast said he should consider the policy in force, and hoped he would pay it in a few days, and the quicker he paid it the better it would suit him. I told him as soon as I could see Lillie he would undoubtedly send the money to him. I took the renewal notice with me as Mr. Tillinghast requested. When I got to the Bassett House the

same evening I inquired for Mr. Lillie; Mr. Wells told me he was not there; do not know that Lillie ever got the renewal notice.    Mr. Lillie told me he was ready to pay as soon as he knew what to pay, and should keep his wages due him from Mr. Wells undisturbed in Wells's hands until this premium was paid, and had been keeping it there for that very purpose. I inquired of Mr. Wells for Mr. Lillie; he asked me if I wanted to see him particularly; I told him I wanted to give him his renewal notice, which was now correct, and which I had with me.    He said, 'Give it to me and I will give you a check for it, if you know what is to be paid;' and said, farther, that Lillie had left his wages and requested him to pay it as soon as I got home.    Mr. Wells drew the check.    The premium, as near as I can remember, was forty-two dollars and some odd cents; and the check was for that amount. This was Saturday evening, May 9th, 1874.    I put the check in my pocketbook, and the first time I saw Mr. Tillinghast I gave it to him.    The check was payable to his order.    I made the attempt to give the check to Mr. Tillinghast Monday evening.    I came to New Haven Monday afternoon; at 4 or 5 o'clock, before going home, I went to Mr. Tillinghast's office for the purpose of giving him this check, or leaving it at his office; this was the only thing that called me there; no one was at the office, and I took the check back, expecting to be in the next day.    I think I gave the check to him Wednesday morning, May 13th; he took it, and gave me a renewal receipt; this I gave to Mr. Wells.

"I have known the company to receive premiums past due six months; and at least twenty-five per cent. of the renewal premiums that I have collected have been collected after they were past due, and accepted by the company without any hesitation, and with knowledge of this fact."

*Cross-Ex.*    "The first I knew of Mr. Lillie's death was about one o'clock of that day; was informed that he died in the morning; cannot tell who first told me; cannot tell where I first heard that he was dead; heard it just after I had returned from New Haven.    I believe he died in the Bassett House; I resided in the next house, about forty-two feet from

the Bassett House; have no other information in regard to his death; think my father told me in the afternoon that he was dead; he said 'He is dead;' that is all he said; I said I knew it; that is all I said that I remember. I saw his remains first the next morning, in the Bassett House.

"I went to see Mr. Tillinghast at Mr. Lillie's request. He asked me if I was going to New Haven the next day. I told him I thought so. He asked me if I would call at Mr. Tillinghast's office and get a correct notice, and find out what he had got to pay, which I did. He asked me nothing in relation to the custom of the company as to failure to pay premiums when due; do not remember that I said anything to him about it; I may have said he had better attend to it. He was employed at the Bassett House as clerk and bar-tender; used to meet him quite often there in the evening; met him at this time on the evening of May 8, 1874, accidentally; had not been there for three or four days; cannot tell who were present, if anybody; think somebody was there. I had an office in New Haven at this time; came to New Haven almost every day; generally came in very early, and stayed late at night; had no stated time for coming or going. Cannot say what has become of the renewal notice which was incorrect. That was all Mr. Lillie requested me to do. No one was present in Mr. Tillinghast's office at the time of my conversation with him in regard to the renewal premium except Miss Lewis; she was clerk there. I think the first time I saw Lillie after Friday, was Monday evening; if I saw him it was at the hotel; think he came home that night; did not see him to speak with him; cannot tell when I next saw him; saw him Tuesday night to speak with him; he was in the bar-room of the hotel; don't think I had any conversation with him Tuesday evening concerning his policy; think this was the last time I saw him in life; am quite sure it was. I conversed with Mr. Lillie on the evening of May 12; it was somewhere between half-past seven and nine o'clock of that evening that I was there; I took nothing from Mr. Tillinghast to him except the renewal notice. I arrived in New Haven on the afternoon of Monday, May 11, 1874, at about half-past four

o'clock; went to Tillinghast's office about six o'clock; was not familiar with his office hours. My office was in the same building, but not on that floor. Mr. Tillinghast's office was usually open all day and evening; very seldom went there during day or evening when I did not find it open. I was not in New Haven on Tuesday, May 12. Was living in the house with my father at this time. Drove to New Haven on the morning of the 13th of May; left home at six o'clock, got to New Haven about seven o'clock; very often came as early as this; sometimes on my regular business, sometimes not. Went to Mr. Tillinghast's office not far from seven o'clock, between seven and eight o'clock. Mr. Richmond, an agent of Mr. Tillinghast, was there. I told Mr. Richmond that I had a check in my pocket that belonged at that office, for a premium; I told him I would leave it with him; he asked whose premium it was, and I told him; he started to the desk, as I supposed, to get the renewal, and said, ' By the way, I think they are locked in the safe, and I have not the key;' said Miss Lewis would be in in a moment, and then she would attend to it for me; I said 'Very well, I have business to attend to; I will come in again;' I went out; I went to Dr. Jewett's office between eight and nine o'clock; Mr. Richmond came up with the renewal receipt in his hand; he said, 'All right, I have got them.' He said, ' Mr. Tillinghast is down stairs;' I said, 'Very well, I will be down in a few minutes.' He went down; in ten minutes, when I had got through with Dr. Jewett, I went down to Mr. Tillinghast's office; Mr. Tillinghast, Miss Lewis, and Mr. Richmond were there; I gave Mr. Tillinghast the check, and he gave me the renewal receipt; he gave me the blank notes, one called a semi-annual cash note, the other was a premium note; the semi-annual note was for thirty-three dollars, the premium note was for sixty-six dollars. I think I gave those notes to Mr. Wells the same day; I suppose those notes were given to me to have Mr. Lillie sign them; I think Mr. Tillinghast asked me to have the notes signed and to bring them back; I think I told him I would; I did not have them signed or sent back; the reason was that I heard Mr. Lillie was dead.

Do not think I had any further conversation with Mr. Tilling hast concerning this matter at this interview. I said nothing to Mr. Tillinghast at this time about the health of Mr. Lillie; left for home on the day I made this payment about eleven o'clock, got home about noon. I did not come expressly for the purpose of delivering up the check. Gave Mr. Wells the renewal notice before he gave me the check; he asked for it; the amount of the check was the same as called for in the renewal notice. When I was in the employ of the company the renewal notes and premium receipts were sent to me by Holloway, and I made the returns to him as general agent; had no business with the home office; did all my business through him and Mr. Powell. I have been told time and time again to hold renewal receipts as long as there was any possibility of collecting; I have returned renewals to Hartford for cancellation, and had them returned to me with instruction to collect them if possible. Do not remember having seen the notes after I gave them to Mr. Wells. My relations up to that time with the company were friendly; have had some difficulty with Mr. Holloway; at this time my relations with him were perfectly friendly. I never was instructed to inquire into the party's health before accepting payment of premiums after they became due. I generally knew that there was no imposition being practiced on the company before accepting payment."

*Re-direct Ex.* "This renewal notice is the one I took on the 9th of May, 1874; I gave the check to Tillinghast between eight and nine o'clock. Had been familiarly acquainted with Mr. Lillie eighteen months; saw him one winter nearly every day; it was winter of 1872–3; was boarding at Tremont House, New Haven, and he was clerk there; I attached the renewal receipt I got on May 13th to the policy; this renewal was dated May 9th; the policy was in the hands of Mrs. Lewis, his mother, when the renewal receipt was attached. I cannot give exact dates or the time, but I have frequently heard Mr. Lillie say that he had a policy on his life in favor of his mother, and that he would sell all his clothes and go hungry before he would let that policy lapse; that he had

---

---

taken it out for his mother, and that he would never change it under any consideration."

Other evidence upon the same point was introduced by the plaintiffs and rebutting evidence by the defendants. The plaintiffs offered the evidence of an agent of the defendants to prove that it was the custom of the defendants to send notices of the amount and time of payment of the premiums thirty days before they became due; that the insured had been informed when he took out his policy that he would be so notified, and that an erroneous notice was sent to him, by which he was misled into the postponement of his payment till the day when it was made. It appeared that the error was merely as to the amount to be paid, and that the time of payment was correctly given. The testimony was given in full in the motion, but the points decided by the court can be sufficiently understood without a further statement of it.

The defendants requested the court to charge the jury that if they should find the fact to be that Lillie died before the money came into the hands of Tillinghast or his agent, the verdict must be for the defendants, unless in some way the defendants had waived the forfeiture, or were estopped from claiming it.

That whatever custom may be proved to have existed with reference to the receipt of premiums over due, yet the fact of the death occurring before anything was paid was fatal to the plaintiffs' case.

That the mere payment of the money was not enough to constitute a payment of the premium, but that the notes should also have been given, or the giving of them waived or prevented by the defendants.

That if this were not so, yet as Beardsley agreed to get the notes signed, his failure to comply with that promise puts an end to the plaintiffs' case.

That Tillinghast had no power to bind the company by an agreement to take a part of the premiums in lieu of the whole; and that he had no power to receive the premium if over-due, except when a certificate of health was presented, or the man appeared in person.

That Tillinghast had no right to make any agreement to keep the policy in force, and if he made one, that it was not binding on the company.

That if he had the right, there was no consideration for the agreement, as there was no agreement on Lillie's part to pay, and the fact of his death before it was carried out put an end to it.

That if it be assumed that the defendants received the $43 paid by Beardsley, yet as they never received the notes to make the full premium, this could not help the plaintiffs.

That there has been no general custom proved in the case, which would make it binding on the company to receive a premium after it became due. That the only custom proved, if any, was a custom of the company to receive premiums after they became due, provided the insured continued in good health. And that this custom to be of any efficacy must have been known to Lillie, and that fact must be proved by the plaintiffs.

That ir Lillie or any one in his behalf had a right to complete the payment of the premium, they must have done so within a reasonable time, and that as they had not done so at all or offered to do so, the verdict must be for the defendants..

The court charged the jury as follows:

"Whatever may be the legal effect of the language of the policy in respect to the payment of the premium, it is agreed by the counsel that it amounts to an agreement that unless the premium due May 9th, 1874, was either paid, or its payment waived by the company, the policy became void. Was then this premium paid, or was its payment waived?

"It is claimed by the plaintiffs that on the 9th day of May, 1874, when this premium became due, Lillie was ready and able to pay it, and would have paid it on that day but for an erroneous notice sent him by the company; that on that or the previous day one Beardsley, a former agent of the company, and then claimed by the plaintiffs to have been acting for Tillinghast, procured a correct notice as to the premium, and obtained in payment thereof a check drawn to Tillinghast's order for the amount due; that on the next day but one

he brought that check to Tillinghast, but being unable to find him, kept it, and brought it in again, in six days after, (Lillie then being dead,) and received the receipt therefor; that Tillinghast took the check, collected the money on it, returned the money to the company, and that the company has kept it ever since, with knowledge of all these facts. The defendants claim that the payment was not thus made to Beardsley, that Beardsley was not acting for Tillinghast, that though Tillinghast took the money and gave the receipt, he was led to do so by fraud, and never returned the money to the company, nor has the company received or retained the same. Upon these questions of fact it is your province to decide.

"If you find the claim of the plaintiffs to be true; if you find that Beardsley was acting for Tillinghast when he took out the corrected notice and received the check on the 9th of May, and that Tillinghast got the money on the check, then the payment to Beardsley was payment to Tillinghast, and through him to the company, and so the cash part of the premium would have been paid in due time.

"If you find that Beardsley was acting for Lillie and not for Tillinghast; that he applied to Tillinghast for a correct notice, and was told by him that the policy should not lapse though there were a few days delay; that Beardsley knew that the company customarily received premiums overdue, and continued the policies alive; and if you find that Beardsley, acting on his knowledge of that custom and the assurances of Tillinghast, did not pay over the money which on the 9th Lillie had paid to him, then, unless you find that he delayed longer than such assurances and such knowledge of that custom warranted, or unless you find that Beardsley or Lillie by some deceit or fraud procured this money to be received, the conduct of Tillinghast in connection with that custom and with his subsequent reception and retention of the money as the agent of the company, would estop the defendants from denying that this money was paid in time, and prevent the forfeiture of this policy on that ground.

"Again, if you find that the payment was not made on the 9th to Beardsley as Tillinghast's agent, and if you find that

there was no estoppel in the manner just described, and so find that there was no payment on the 9th, and no warrant for Beardsley's delay to pay over the check after he had received it, yet if you find that it was the custom of this company to give notices of the payment thirty days before it came due, and that Lillie knew of such custom, and that by the erroneous notice Lillie was misled and prevented from making this payment, when otherwise he was ready and willing to pay and would have paid it, then also are the company estopped from claiming that this payment was not made in due time, nor was the policy forfeited on that account, provided the payment was made or tendered within a reasonable time after the correct notice had been sent.

"If you find that there was no payment of this premium to the company or any of its agents before the death of Lillie, and that the company are not estopped in either of the ways already mentioned from claiming that the policy was forfeited, yet if you find that Tillinghast received this money after Lillie's death, and sent the money to the company, and that the company, with full knowledge of all the facts, has kept that money, or has exercised such dominion over it as shows that they claimed it as their own, then again they are estopped from denying that they have received such premium in due time, and have waived the forfeiture of this policy so far as that is concerned.

"It is claimed here that this premium was to be paid part in cash and part in notes. The same rules which govern the payment of the cash part of this premium may be taken by you as controlling the giving of the notes, it being the law governing this contract that the premium must be paid or its payment waived by the company, in order to save the policy from forfeiture."

The jury having returned a verdict for the plaintiffs, the defendants moved for a new trial for errors in the charge of the court.

*L. M. Hubbard,* in support of the motion.

1. The court erred in the first section of the charge in

submitting to the jury the question whether Beardsley was acting for Tillinghast when he received the check for the premium on the 9th of May. The sole evidence on this subject is the deposition of Beardsley, which shows conclusively that he was acting only as the friend and agent of Lillie. We contend that the court has no right to submit such a claim as this to a jury without any comment upon the fact that the evidence does not furnish any support for such a claim. There must at least be a plausible claim deduced from the evidence in the case. Here there is none. Wells on Questions of Law and Fact, § 408, *et seq.*

2. The second section of the charge is wrong. The court entirely overlooked the fact that Lillie was dead when the money was paid. However correct this might be in an ordinary case where the policy had lapsed in consequence of non-payment of the premium, the cases all say that death puts an end to the right to pay. The case is not one where the agent agrees to keep the policy alive and does so in fact by crediting the company with the amount. *Simpson* v. *Accidental Death Ins. Co.*, 2 Com. Bench, N. S., 257; *Pritchard* v. *Merchants & Tradesmen's Life Assur. Soc.*, 3 id., 622; *Want* v. *Blunt*, 12 East, 183; *Mut. Benefit Life Ins. Co.* v. *Ruse*, 8 Geo., 534; *Ruse* v. *Mut. Benefit Life Ins. Co.*, 26 Barb., 556.

3. The third section of the charge is also incorrect. It is based on the idea that Lillie was misled and prevented from making the payment at the proper time. It appears that a notice was sent to Lillie thirty days before the premium was due, but that the amount of cash called for was incorrect. Instead of a cash note for $33.44, that sum was called for in cash in addition to $43.85, the real amount due. This mistake was known to Lillie, and he kept the notice, without making any attempt to get it corrected until the evening of the day before the premium became due. He then gave the notice to Beardsley to take it to New Haven and get it corrected. This is the only foundation of the claim that Lillie was "misled." The absurdity of a claim of estoppel on this point of the case is too apparent for discussion. Bliss on Life Insurance, § 267.

4. The fourth section of the charge is wrong. There is

no evidence that the money ever was sent to the company. Nor any that the company has kept the money, or has exercised such dominion over it as shows that they claimed it as their own. We admit that, in a case where the insured is still alive, the receipt from the agent by the company of the premiums, although paid when overdue, would be a waiver of the forfeiture. But this proposition can have no application where the insured is dead when the premium was paid. The company would not have been bound had the money been paid to them directly, the insured being dead, without knowledge of the fact.

5. The fifth point is also incorrect. The first part of the charge also shows an entire misapplication of the facts of the case. It was a conceded fact in the case that the premium notes which went to make up the full premium were never given, never even signed, nor was their equivalent ever tendered to the defendants. Of course there could have been no waiver by the defendants as to the time of receiving them when they were never even tendered.

6. The defendants asked the court to charge the jury, among other things, that Tillinghast had no right to make any agreement to keep the policy in force, and if he made one, that it was not binding on the company; that even if we assume that the defendants had received the $43 paid by Beardsley, yet as they never received the notes to make the full premium, this cannot help the plaintiffs; that if Lillie or any one in his behalf had a right to complete the payment of the premium, they must have done so within a reasonable time, and that as they had not done so at all or offered to do so, the verdict must be for the defendants. None of these propositions were charged by the court, as they ought to have been upon principles already established.

*A. H. Robertson*, contra.

1. The failure of the company to send a right notice to the insured, who was informed by the agent of the company that he might rely on a notice being sent, by reason whereof the insured failed to pay his premium before May 9th, prevents

the company from insisting on a forfeiture. *Mayers* v. *Mutual Life Ins. Co.*, 4 Bigelow Ins. Cas., 67; *Home Life Ins. Co.* v. *Pierce*, 5 Ins. Law Jour. (Ap. 1876), p. 290. A wrong notice was no notice at all. The company was responsible for the wrong notice sent by their agent. *Miller* v. *Mutual Benefit Life Ins. Co.*, 2 Bigelow Ins. Cas., 699.

2. The receiving of the premium on the 13th of May by Tillinghast, the general agent of the company, was a waiver of the forfeiture of the policy, and the company was bound by such receipt in accordance with the known custom of the company's agent, acquiesced in by the company, of receiving premiums which were overdue. *Walsh* v. *Ætna Life Ins. Co.*, 30 Iowa, 133; *Thompson* v. *St. Louis Mut. Life Ins. Co.*, 52 Misso., 469; *Currier* v. *Continental Life Ins. Co.*, 53 N. Hamp., 538; *Bouton* v. *Am. Mut. Life Ins. Co.*, 25 Conn., 542; *Buckbee* v. *U. States Ins. Annuity & Trust Co.*, 18 Barb., 541; *Froehlich* v. *Atlas Life Ins. Co.*, 47 Misso., 406; May on Life Ins., § 507.

3. The reception of the premium by the company from their agent, and the keeping of the same, with a full knowledge of all the facts under which the premium was received by the agent, estopped the defendants from claiming that the premium was not paid, and that the policy was forfeited. *Hodsdon* v. *Guardian Life Ins. Co.*, 97 Mass., 144; *Armstrong* v. *Turquand*, 9 Irish Law Reps. N. S., 32; *Supple* v. *Cann*, id., 1265.

4. The fact that the notes were not signed by Lillie is immaterial to the plaintiffs' claim.—1st. The fault, if any, was that of the company in not sending notes by Beardsley to be signed when he received the check.—2d. The notes were not due for six months, and could be signed any time before they were due by Lillie, if living.—3d. The premium was an annual one, divided into two parts or payments, for the benefit of the insured, and therefore the jury was right in deducting them as due from the insured to the company. *Hesterberg* v. *Equitable Life Ins. Co.*, 1 Cincinnati Superior Ct. R., 483; *S. C.*, 2 Bigelow Ins. Cas., 755.

CARPENTER, J.   George T. Lillie, whose life was insured by the defendants, died on the 13th day of May, 1874.   By the terms of the policy the semi-annual premium, payable partly in cash and partly in notes, fell due May 9th, 1874.   On that day Charles T. Wells drew his check payable to C. E. Tillinghast, an agent of the defendants, for the amount of the cash part of the premium, and delivered it to one Beardsley. Beardsley on the 13th day of May, and after Lillie's death, delivered the check to Tillinghast, who, not knowing of Lillie's death, took it, and gave to him the renewal receipt.   The notes were never given.   The jury rendered a verdict for the plaintiffs.

The defendants move for a new trial.

We will consider only the alleged errors in the charge of the court to the jury.

The evidence in the case is stated at length in the record. Upon a careful consideration of the evidence in connection with the charge, we are satisfied that the charge was not adapted to the evidence, but on the contrary was so expressed as to be liable to mislead the jury and induce them to come to a wrong result.   The simple facts of the case, which are conceded, or established by the proof beyond controversy, that Lillie was dead when the cash premium was paid, that that fact was unknown to Tillinghast or the defendants, and that the premium notes were never given as required by the express terms of the policy, would seem to be conclusive against the plaintiffs.   The defendants in substance requested the court so to charge the jury.   As the case is presented before us we do not see why they were not entitled to have that request complied with.   We do not overlook the fact that there was a claim that the defendants had waived the non-payment of the premium, and that they were estopped from claiming that the policy was thereby forfeited.   Those claims will be noticed more fully hereafter.

The court, after stating the claims of the parties, said to the jury:—

" If you find that Beardsley was acting for Tillinghast when he took out the corrected notice and received the check on the

9th day of May, and that Tillinghast got the money on the check, then the payment to Beardsley was payment to Tillinghast, and through him to the company, and so the cash part of the premium would have been paid in due time."

This charge might have been proper if there had been any evidence that Beardsley was the agent of Tillinghast, or if there had been conflicting evidence upon that point; or if, in connection with it, the court had called the attention of the jury to the evidence, so that the jury could have seen that the plaintiffs' claim was not supported by proof. The case shows that all the evidence upon that point was to the effect that Beardsley was the agent of Lillie, and there was no evidence to show that he was acting as the agent of Tillinghast.

The charge therefore was not such as the case called for. It was a distinct intimation to the jury that they were at liberty to find, notwithstanding there was no evidence to the fact, and notwithstanding the evidence showed the contrary to be true, that Beardsley acted as the agent of Tillinghast. It is the duty of the court to submit to the jury all controverted questions of fact when there is any evidence to support the respective claims of the parties; but if a claim is made against the evidence in the case, and wholly unsupported by proof, it is error to submit it to the jury as if the evidence justified the claim, and without comment, as there is great danger of its leading to an unjust verdict. Under this charge the jury may have found that Beardsley was the agent of Tillinghast.. If so, the verdict was manifestly unjust.

The court further said to the jury:—

"If you find that Beardsley was acting for Lillie and not for Tillinghast; that he applied to Tillinghast for a correct notice, and was told by him that the policy should not lapse though there were a few days delay ; that Beardsley knew that the company customarily received premiums overdue, and continued the policies alive; and if you find that Beardsley, acting on his knowledge of that custom and the assurances of Tillinghast, did not pay over the money which on the 9th Lillie had paid to him, then, unless you find that he delayed longer than such assurances and such knowledge of that cus-

tom warranted, or unless you find that Beardsley or Lillie by some deceit or fraud procured this money to be received, the conduct of Tillinghast, in connection with that custom, and with his subsequent reception and retention of the money as the agent of this company, would estop the defendants from denying that this money was paid in time, and prevent the forfeiture of this policy on that ground."

This sentence is long and somewhat involved, and it is doubtful whether the jury understood what the judge meant by it; but assuming that they did, and assuming that we after careful study rightly apprehend its meaning, it would seem that the jury was instructed, provided the facts should be found as therein stated, to apply the doctrine of estoppel. Even if there were no other facts in the case bearing on this question than those stated by the judge in his charge, we should very much doubt whether the doctrine of estoppel would properly apply to this case. We are by no means prepared to sanction the claim that there was any such custom proved as will vary the terms of the written contract. The policy is explicit that the premium must be paid on or before the day it falls due. The renewal receipt given to Beardsley contains on its reverse side a printed notice, in which it is distinctly stated that no agent has authority "to receive any premium after date of its being due without special permission from the officers of the company." It is extraordinary that local and limited agents should have the power, by a course of dealing with the policy-holders, to establish a custom which shall practically nullify these plain provisions, and bind the company without its knowledge or consent. We are inclined to think that all that can be claimed from the custom proved is, that the company or its agents are in the habit of waiving strict payment at the day in some cases, when there is no change in the health or condition of the insured. Hence, it seems from the evidence that when payment has been deferred but a short time, and there is nothing to excite suspicion, the premiums have been received without further inquiry; but if the premium has been delayed a long time, or there are other suspicious circumstances, the usual course seems to have been

to require a certificate of continued good health. If we are right in our views of the evidence there is nothing that will bind the company to waive strict payment in any case, but they are at liberty to insist in any and all cases upon strict performance. That being so the risk of the delay is with the insured, and if death or sickness occur after the premium is due and before payment, the company would be at liberty to refuse the premium. Now the vice in the charge of the court was, that it did not take into consideration the all-important fact that the insured was dead when the premium was paid, and that Tillinghast was not aware of his death when he received it. It assumed that the assurances of Tillinghast and the custom proved obligated the company, provided the agent actually received the money, without reference to the material facts. Whatever may be the effect of the agent's promise, if he made any such promise, that the policy should be valid notwithstanding the delay of payment, whatever might happen to Lillie in the mean time, it is manifest that the custom proved did not extend to a case in which the insured died after the premium fell due and before payment. We think, therefore, that the court was wrong in charging the jury that, under the circumstances, the company would be estopped from denying that the money was paid in time.

The jury were further instructed that, "if they should find that it was the custom of this company to give notices of the payment thirty days before it came due, and that Lillie knew of such custom, and that by the erroneous notice Lillie was misled and prevented from making this payment, when otherwise he was ready and willing to pay and would have paid it, then also are the company estopped from claiming that this payment was not made in due time, nor was the policy forfeited on that account, provided the payment was made or tendered within a reasonable time after the correct notice had been sent."

We see nothing in this transaction that should operate as an estoppel. There is no evidence that the company or its agents intentionally sent an erroneous notice. There was no intention or motive to mislead or deceive. The error was

simply a mistake; and Lillie, when he received the notice, knew that it was a mistake. There was no mistake, however, in respect to the time when the premium fell due. It related solely to the amount. There is no evidence that Lillie was, in fact, deceived or misled, and no deception can be inferred from the circumstances. He knew that the amount was erroneously stated, and he knew how to have it corrected when first received, as well as he did when he employed Beardsley. There is no pretense that he had then received any additional information. It was his own folly to wait until the premium was due before taking measures to correct the mistake. The delay therefore was justly attributable to his own want of diligence rather than to the mistake of Tillinghast.

The court next stated to the jury:—"If you find that Tillinghast received this money after Lillie's death, and sent the money to the company, and that the company, with full knowledge of all the facts, has kept the money, or has exercised such dominion over it as shows that they claimed it as their own, then again they are estopped from denying that they have received such premium in due time, and have waived the forfeiture of the policy so far as that is concerned."

There is some doubt from the evidence whether the money was actually received by the company; but as that is purely a question of fact, we do not care to discuss it. If received, whether, under the circumstances, it constituted a waiver or not, is a different question. "A waiver is an intentional relinquishment of a known right." It is incredible that a company or its agents, if rational men, knowing of Lillie's death, and that the premium was overdue and unpaid, should receive the premium, and thereby intentionally give force and validity to the policy, which otherwise was inoperative. It does not appear when the company first knew of Lillie's death, and that the premium was not paid until after his death. If, with full knowledge of that fact, they accepted this premium, they would be bound by it. But if, as is probable, they first knew of it after a claim was made upon them for the sum insured, then the retention of the money while investigating the case, and pending litigation, could not be regarded as any evidence of a waiver or as constituting an estoppel.

In connection with this charge the attention of the jury should have been called to these circumstances, and they should have been instructed to ascertain when they received the money, if they received it at all, and whether at that time they knew that Lillie was dead, and if not, when they first knew of it, and under what circumstances, and what their conduct then was—whether they retained it intending to give force and validity to the policy, or retained it awaiting the result of the plaintiffs' claim. It seems to us that injustice might have been done to the defendants by this part of the charge.

In conclusion, the court charged the jury as follows:—" It is claimed here that this premium was to be paid, part in cash and part in notes. The same rules which govern the payment of the cash part of this premium may be taken by you as controlling the giving of the notes, it being the law governing this contract that the premium must be paid or its payment waived by the company, in order to save the policy from forfeiture."

This was manifestly erroneous. If the notes had been signed by Lillie, had been given to Tillinghast at the same time the money was paid, and had been treated by him the same as the money was, then the law applicable to the cash premiums would apply equally well to the notes. But the notes were never received by the company or its agent; in fact were never signed by Lillie. The facts were entirely different, and the charge should have had some reference to the facts. We have noticed in detail four several sections or paragraphs of the judge's charge in respect to the cash part of the premium, in every one of which the judge submits to the jury a distinct question. In every instance the actual payment of the cash premium to Tillinghast as an agent of the company is made an *important and material element.* How the same rules which govern the payment of the cash premium may be regarded as controlling the giving of the notes is beyond our comprehension.

The defendants requested the court to charge the jury that these notes should also have been given, or the giving of them

waived or prevented by the defendants. This request should have been complied with. If it had been, then unless the jury had found a waiver, or that the defendants prevented the giving of the notes, (of which we discover no evidence,) the verdict would probably have been the other way.

For these reasons we advise a new trial.

In this opinion the other judges concurred.